**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| STEPHEN DOUGLASS, individually<br>and as personal representative of the<br>ESTATE OF SHINGO ALEXANDER DOUGLASS )<br><br>DORA HERNANDEZ, individually<br>and as personal representative of the<br>ESTATE OF NOE HERNANDEZ )<br><br>LAN HUYNH, individually<br>and as personal representative of the<br>ESTATE OF NGOC TRUONG HUYNH )<br><br>DARROLD MARTIN, individually<br>and as personal representative of the<br>ESTATE OF XAVIER ALEC MARTIN )<br><br>ERIN REHM, individually<br>and as personal representative of the<br>ESTATE OF GARY LEO REHM, JR. )<br><br>LLOYD WAYNE RIGSBY, JR., individually<br>and as personal representative of the<br>ESTATE OF DAKOTA KYLE RIGSBY )<br><br>and )<br><br>CARMEN SIBAYAN, individually<br>and as personal representative of the<br>ESTATE OF CARLOS VICTOR GANZON SIBAYAN )<br><br>    *Plaintiffs*, )<br><br>v. )<br><br>NIPPON YUSEN KABUSHIKI KAISHA )<br><br>    *Defendant*. ) | CIVIL ACTION NO: 19-cv-13688<br><br>SECTION "I" (3)<br><br>JUDGE: LANCE M. AFRICK<br><br>MAGISTRATE: DANA DOUGLAS |

## COMPLAINT

Plaintiffs Stephen Douglass, individually and as personal representative of the Estate of

Shingo Alexander Douglass, Dora Hernandez, individually and as personal representative of the

Estate of Noe Hernandez, Lan Huynh, individually and as personal representative of the Estate of Ngoc Truong Huynh, Darrold Martin, individually and as personal representative of the Estate of Xavier Alec Martin, Erin Rehm, individually and as personal representative of the Estate of Gary Rehm, Jr., Lloyd Wayne Rigsby, Jr., individually and as personal representative of the Estate of Dakota Kyle Rigsby, and Carmen Sibayan, individually and as personal representative of the Estate of Carlos Victor Ganzon Sibayan, by and through the undersigned counsel, bring these wrongful death and survival actions against Defendant Nippon Yusen Kabushiki Kaisha (hereinafter "NYK Line"). Based upon knowledge, information, and belief, these Plaintiffs allege the following:

## BACKGROUND

1.      These claims arise out of the collision between the *USS Fitzgerald* and the *ACX Crystal* off the coast of Japan on June 17, 2017. The collision flooded the *USS Fitzgerald*, killing seven (7) young Sailors and injuring scores of others.[1] The Plaintiffs in this action represent all of the Sailors who were killed as a result of the *ACX Crystal*'s crew's reckless and negligent conduct. All decedents suffered severe physical and emotional pain and distress prior to drowning as a direct result of the collision and its aftermath.

## PARTIES

**The Plaintiffs**

2.      Plaintiff Stephen Douglas is a resident of Oceanside, California, and is the Personal Representative of the Estate of Shingo Alexander Douglass. Shingo Alexander Douglass was born on December 19, 1991. Shingo's residence at the time of death was in Oceanside, California. At

---

[1] *See Alcide, et al. v. Nippon Yusen Kabushiki Kaisha*, which is the companion case for Sailors who survived this collision.

the time of his death, he was a Yeoman 3rd Class (E-3) in the U.S. Navy. Plaintiff Stephen Douglass was his father.

3.       Plaintiff Dora Hernandez is resident of Edinburgh, Texas, and is the Personal Representative of the Estate of Noe Hernandez. Noe Hernandez was born on December 17, 1990. Noe's residence at the time of death was in Japan. At the time of his death, he was a Gunner's Mate 2nd Class (E-5) in the U.S. Navy. Plaintiff Dora Hernandez was his wife.

4.       Plaintiff Lan Huynh is a resident of Broken Arrow, Oklahoma, and is the Personal Representative of the Estate of Ngoc Truong Huynh. Ngoc Truong Huynh was born on June 16, 1992. Ngoc's residence at the time of death was in Oakville, Connecticut. At the time of his death, he was a Sonar Technician 3rd Class (E-4) in the U.S. Navy. Plaintiff Lan Huynh was his sister.

5.       Plaintiff Darrold Martin is a resident of Halethorpe, Maryland, and is the Personal Representative of the Estate of Xavier Alec Martin. Xavier Alec Martin was born on September 27, 1992. Xavier's residence at the time of death was in Halethorpe, Maryland. At the time of his death, he was a Personnel Specialist 1st Class (E-6) in the U.S. Navy. Plaintiff Darrold Martin was his father.

6.       Plaintiff Erin Rehm is a resident of Hampton, Virginia, and is the Personal Representative of the Estate of Gary Leo Rehm, Jr. Gary Leo Rehm, Jr. was born on October 2, 1979. Gary's residence at the time of death was in Hampton, Virginia. At the time of his death, he was a Fire Controlman 1st Class (E-6) in the U.S. Navy. Plaintiff Erin Rehm was his wife.

7.       Plaintiff Lloyd Wayne Rigsby, Jr. is a resident of Palmyra, Virginia, and is the Personal Representative of the Estate of Dakota Kyle Rigsby. Dakota Kyle Rigsby was born on September 12, 1997. Dakota's residence at the time of death was in Palmyra, Virginia. At the time

of his death, he was a Gunner's Mate Seaman (E-2)  in the U.S. Navy. Plaintiff Lloyd Wayne Rigsby, Jr. was his father.

8.     Plaintiff Carmen Sibayan is a resident of Chula Visa, California, and is the Personal Representative of the Estate of Carlos Victor Ganzon Sibayan. Carlos Victor Ganzon Sibayan was born on December 8, 1993. Carlos's residence at the time of death was in Chula Vista, California. At the time of his death, he was a Fire Controlman 2nd Class (E-5) in the U.S. Navy. Plaintiff Carmen Sibayan was his mother.

**The Defendant**

9.     The defendant in this case is Nippon Yusen Kabushiki Kaisha, a Japanese corporation, doing business as "NYK Line," and is hereinafter referred to as **NYK Line**. NYK Line's corporate headquarters is located at 3-2 Marunouchi, 2-Chome, Chiyoda-Ku, Tokyo 100-0005, Japan.

10.     Upon information and belief, NYK Line is one of the largest shipping and logistics conglomerates in the world, doing business globally in Japan and the United States, as well as North and South America, Australia, Africa, East and South Asia, and Europe.

11.     On its website,[2] NYK Line holds out to the public that its business operates as a corporate "Group" through several hundred wholly-owned subsidiary companies. NYK Line has accordingly adopted a "Group Mission Statement," a "Code of Conduct," a "Business Credo," and a "Corporate Profile." The NYK Line "Group" operates a fleet of 710 vessels (as of March 19, 2019). NYK Line has formally adopted "Corporate Governance Guidelines," effective November 26, 2015, that emphasize the integrated operation of the NYK Group. Article 2 of these Guidelines refers to operating a "set of systems, organizations or frameworks" for making business decisions.

---

[2] https://nyk.com/english

Article 3 of these Guidelines formally adopts the Group Mission Statement and integrated management of all NYK companies.

12.     On June 17, 2017, the date of the collision between the *ACX Crystal* and the *USS Fitzgerald*, the registered owner of the *ACX Crystal* was Olympic Steamship Co. S.A., a Panamanian corporation. Upon information and belief, Olympic Steamship Co. S.A. is a special purpose entity that was acting on behalf of Dainichi-Invest Co. Ltd., a Japanese company with its sole office in Kobe, Japan. Upon information and belief, Dainichi-Invest Co. Ltd. is an investment entity acting on behalf of the real owner of the *ACX Crystal*, NYK Line.

13.     As NYK Line itself stated in multiple press releases published on its website in the immediate aftermath of the collision, NYK Line was the sole charterer of the *ACX Crystal* on June 17, 2017.[3] Upon information and belief, on the date of the collision, NYK Line was acting as the demise (bareboat) charterer of the *ACX Crystal*, with principal responsibility for the navigation and/or operation of the *ACX Crystal.* Alternatively, upon information and belief, NYK Line was acting as the time charterer of the *ACX Crystal* and participated in the navigation of the *ACX Crystal* on June 17, 2017. Thus, upon information and belief, NYK Line engaged in and/or participated in the negligent conduct that caused the death of the Plaintiffs' decedents in this action. In fact, NYK Line has publicly apologized for the collision,[4] an acknowledgement of responsibility.

14.     Upon information and belief, as stated in the English translation of the *Marine Accident Investigation Report* released by the Japan Transport Safety Board (JTSB) [hereinafter JTSB Report], at the time of the collision an officer of the *ACX Crystal* was "a navigator of NYK

---

[3] *See* Exhibits 1-4
[4] *See* Exhibit 1

Containr [sic] Line Co., Ltd." Further, according to the JTSB Report, NYK Container Line Co. Ltd. was the "operator" of the *ACX Crystal* at the time of the collision.

15.     Upon information and belief, on June 17, 2017, Asia Container Express, known as ACX, employed the *ACX Crystal* for the purpose of shipping containers. Asia Container Express is the intra-Asia container shipping arm of NYK Line. Thus, on the date of the collision, NYK Line was involved in multiple ways in the operation and navigation of the *ACX Crystal.*

16.     Upon information and belief, NYK Container Line Co. Ltd., Asia Container Express, and other NYK affiliated companies or business entities participating in the management and/or navigation of the *ACX Crystal* on June 17, 2017, were acting as agents and/or instrumentalities of NYK Line.

## JURISDICTION, CHOICE OF LAW, VENUE, AND THE DEFENDANT'S PERVASIVE CONTACTS WITH THE UNITED STATES

17.     This court has jurisdiction of these causes of action pursuant to 28 U.S.C. § 1333 (admiralty and maritime cases), and the Plaintiffs in this case choose to proceed under the saving to suitors clause of 28 U.S.C. § 1333, which authorizes Plaintiffs to invoke the jurisdiction of this court and to proceed under 28 U.S.C. § 1332 (diversity of citizenship), all claims being in excess of $75,000 excluding costs and interest. In addition, the court has jurisdiction over this case under 28 U.S.C. § 1331 (federal question).

18.     Although the collision that is the subject of this cause occurred approximately 80 nautical miles southwest of the US Naval base at the port of Yokosuka, Japan, and within the territorial waters of Japan, maritime choice of law principles announced by the Supreme Court of

the United States[5] point unequivocally to the application of United States law in this cause of action.

19.     The claims in the case at bar arise under the Death on the High Seas Act (DOHSA), 46 U.S.C. § 30301 et seq. DOHSA applies to this case in that the negligence committed by personnel working as agents and/or instrumentalities of NYK Line in connection with the collision between the *USS Fitzgerald* and the *ACX Crystal*, which caused the deaths of all Plaintiffs' decedents in this Complaint, occurred on the "high seas" more than three nautical miles from the shores of the United States. In addition, Japanese law applies through the application of DOHSA, 46 U.S.C. § 30306.

20.     Personal jurisdiction over NYK Line is proper in the case at bar pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure in that the claims involved arise under federal law, NYK Line is a foreign corporation that is not subject to jurisdiction in any state's court of general jurisdiction, and NYK Line has substantial, systematic and continuous contacts with the United States as a whole. Thus, this court has personal jurisdiction over NYK Line in the case at bar, consistent with the Fifth Amendment's Due Process Clause.

21.     NYK Line's presence in the United States is long-standing: It first opened its offices in New York in 1920.[6]

22.     Upon information and belief, NYK Line operates at least thirteen wholly-owned subsidiary companies in the United States. Upon further information and belief, NYK Line conducts numerous business activities in the United States, including operating twenty-seven shipping terminals in United States' ports, more than it operates in Japan.

---

[5]*See e.g. Lauritzen v. Larson,* 345 U.S. 571 (1953); *Romero v. International Terminal Operating Co*., 358 U.S. 354 (1959); and *Hellenic Lines v. Rhoditis*, 398 U.S. 306 (1970).
[6] *See* Exhibit 5

23.     Part of NYK Line's corporate "Group" includes a Regional Management Office in Secaucus, New Jersey, as well as subsidiaries across the United States that collectively serve each of NYK Line's business industries, including Liner Trade, Logistics, Bulk Shipping, and other business services.

24.     NYK Line employs approximately 2,700 people in North America, the vast majority of whom are employed in the United States.

25.     Upon information and belief, NYK Line vessels regularly call on at least thirty United States' ports, located both on the east and west coasts and the Gulf of Mexico, including the port of New Orleans.

26.     NYK Line has offices in many states in the United States, including Secaucus, New Jersey and Los Angeles and Oakland, California.

27.     NYK Line's business activities in the United States are under the control of NYK Line as to sales, finance, and corporate policies.

28.     Upon information and belief, NYK Line operates its wholly-owned subsidiaries in the United States and its U.S. offices as a corporate group and an integrated whole. Upon information and belief, NYK Line shares high-level corporate personnel with its wholly-owned U.S. subsidiaries. For example, the Chief Executive Officer of NYK Line North America, Mr. Hiroshi Kubota, is also a corporate officer of NYK Line, Tokyo, and a member of NYK Line's Corporate Planning Group and Group Management Promotion Group in Tokyo. Upon information and belief, Mr. Kubota had and continues to have corporate responsibilities as it relates to NYK Line in Japan and in the United States. Mr. Kubota has lived and worked for NYK Line in both

the United States and Japan. Upon further information and belief, he currently acts as the Chief Executive Officer of NYK North America while living in Japan and working for NYK Line.[7]

29.     NYK Line's Group Americas is one of NYK Line's primary subsidiaries and NYK Line maintains 100 percent of its voting rights. Upon information and belief, NYK Line's wholly-owned subsidiaries operating in the United States act as agents and/or instrumentalities of NYK Line. Under these circumstances, it would be grossly unfair to allow NYK Line to evade this court's jurisdiction by relying on its many wholly-owned subsidiaries to disguise its own pervasive contacts with the United States.

30.     NYK Line's acquisitions in the United States also demonstrate the extent of its contacts here. For example, upon information and belief, in 2002, NYK Line acquired and now owns Ceres Terminals, which operates ports and terminals throughout the United States.[8] Ceres Terminals operates New Orleans Terminal LLC at the Napoleon Avenue Terminal. This terminal handles 165,000 containers per year.[9] Ceres Terminals has an active filing with the Louisiana Secretary of State.

31.     Also in Louisiana, NYK Line is actively promoting its new ventures in Liquefied Natural Gas. Upon information and belief, NYK Line is an equity partner in a natural gas facility that recently opened in Hackberry, Louisiana. The project plans to produce 12 million tons of liquefied natural gas per year.[10] Additionally, upon information and belief, NYK Line signed a deal to manage the shipment of liquefied natural gas from Louisiana.[11] Importantly, NYK Line has the world's largest share of total liquefied natural gas capacity (6.3 percent).

---

[7] *See* Exhibits 6-8
[8] https://www.nyk.com/english/ir/library/fact01/pdf/2017_factbook01_all.pdf
[9] https://www.ceresglobal.com/locations/new-orleans.html
[10] https://www.nyk.com/english/news/2019/20190514_01.html
[11] MarineLink, "NYK in Charter Agreement with Mitsubishi," (December 12, 2018)
https://www.marinelink.com/news/nyk-charter-agreement-mitsubishi-460665 (accessed Nov. 1, 2019).

32.     Additionally, in November 2016, NYK Line acquired a 20 percent stake in Maher Terminals, which operates a terminal in the United States Port of New York and New Jersey. The Maher terminal is the largest in the port.[12]

33.     NYK Line devotes a substantial amount of resources to do business with the United States. In 2012, NYK Line dedicated seven of its vessels exclusively for Toyota's North American service for the delivery of automobiles to the United States.[13]

34.     Overall, NYK Line's revenue in North America for the fiscal year ending March 31, 2017 was $1.36 billion. For the fiscal year ending March 31, 2019, NYK Line's revenue in North America was $1.47 billion. Upon information and belief, the vast majority of this revenue came from business activity in and with the United States.

35.     In 2013, NYK Line reportedly stood as the 12th ranked container carrier in the containerized import trade for the United States. NYK Line's market share is increasing rapidly year-over-year.[14]

36.     In 2013, NYK Line was ranked 10th in the United States containerized export trade. NYK Line's market share is increasing rapidly year-to-year.[15]

37.     As even further evidence of their significant business activities in the United States, NYK Line previously engaged in a criminal scheme in furtherance of its business interests. According to the United States Department of Justice, between 1997 to at least 2012, NYK Line was involved in a "conspiracy to fix prices, allocate customers, and rig bids of international ocean shipping services for roll-on, roll-off cargo, such as cars and trucks, to and from the United States

---

[12] https://www.nyk.com/english/release/4208/004529.html
[13] The New York Times, "Around the World with 5,500 Cars" (July 13, 2012).
https://www.nytimes.com/2012/07/15/automobiles/around-the-world-with-5500-cars.html (accessed Nov. 1, 2019).
[14] JOC Maritime News, "NYK Line," https://www.joc.com/maritime-news/container-lines/nyk-line (accessed Nov. 1, 2019).
[15] *Id.*

and elsewhere."[16] NYK Line pleaded guilty to felony charges associated with this criminal price fixing conspiracy for shipments to and from the United States.[17] For its extensive felonious activities with the United States for more than a decade, NYK Line paid about $60 million in criminal fines.[18]

38.     NYK Line has purposefully and profitably availed itself of the benefits and protections afforded by the United States' Constitution and laws. Accordingly, NYK Line's contacts with the United States as a whole are so significant, extensive, systematic, and continuous as to render it essentially "at home" in the United States.

39.     Venue in the case at bar is proper in this court pursuant to 28 U.S.C. § 391(b)(3), as this is a judicial district in which NYK Line is subject to this court's service of process and personal jurisdiction with respect to this action, and there being no other judicial district in which NYK Line resides, or in which a substantial part of the events or omissions relating to the case at bar occurred.

---

[16] Department of Justice Press Release, "Third Company Agrees to Plead Guilty to Price Fixing on Ocean Shipping Services for Cars and Trucks," (December 29, 2014), https://www.justice.gov/opa/pr/third-company-agrees-plead-guilty-price-fixing-ocean-shipping-services-cars-and-trucks (accessed Nov. 1, 2019).
[17] *Id.*
[18] *Id.*

## FACTS APPLICABLE TO ALL COUNTS

### Introduction and Background of the *USS Fitzgerald*



*Figure 1: The USS Fitzgerald in September 2014*

40.     The *USS Fitzgerald* is a 505-foot long, 8,300-deadweight ton Arleigh Burke-class destroyer that is owned and operated by the United States Navy. The *USS Fitzgerald* was launched in January 1994 and commissioned in October 1995.

41.     On the morning of June 16, 2017, the *USS Fitzgerald* left its home port of Yokosuka, Japan, to conduct military operations. It had onboard one Commanding Officer, three Watch Officers, one Able Seaman, and 288 Crewmembers.

42.     On June 17, 2017, at approximately 1:30 AM,  the *ACX Crystal*, a container ship, struck the *USS Fitzgerald*. The collision happened in the vicinity of the Mikomoto Shima

Voluntary Traffic Separation Scheme (VTSS), approximately nine (9) nautical miles off the coast of Japan.

43.    The *ACX Crystal*'s bow collided with the *USS Fitzgerald* on its starboard side, tearing a 13' x 17' hole in its hull, just aft of Berthing Unit 2. It also breached the Auxiliary Machine Room of the *USS Fitzgerald,* causing flooding.



*Figure 2: Diagram of approximate point of impact between the USS Fitzgerald (left) and the ACX Crystal (right)*

44.    The striking of the *USS Fitzgerald* by the *ACX Crystal* caused the drowning deaths of seven (7) Sailors, all of whom resided in Berthing Unit 2 on the *USS Fitzgerald*'s starboard side and are the subjects of this Complaint.

**Configuration of the *USS Fitzgerald***



*Figure 3: Diagram of Berthing Unit 2 layout indicating location of egress points and rack rows*

45.     Berthing Unit 2 has three egress points: a water-tight hatch and an emergency escape scuttle on the port-side, and a non-tight door set in a non-structural bulkhead on the starboard side.

46.     On the port-side, a ladder leads from Berthing 2 through a hatch with a water-tight scuttle to the Berthing 1 port vestibule.

47.     On the starboard side, a non-tight door leads aft into the Berthing 2 starboard vestibule, which has a ladder up through a hatchway to the Berthing 1 starboard vestibule.

48.     The non-tight door leads forward into a lounge on the starboard side.

49.     There is no water-tight hatch between Berthing 1 and Berthing 2 starboard vestibules.

50.     Berthing Unit 2 has 42 racks. The racks are positioned in four rows and are in stacks of three, such that there is a bottom, middle, and top rack.

51.     All seven deceased Sailors' racks were located in rows 3 and 4, the rows nearest the starboard side hole in the *USS Fitzgerald*'s hull. Fourteen of the 24 Sailors in these rows escaped Berthing Unit 2. None of the deceased Sailors were found in this area.

52.     The head (toilet) is located on the forward side of Berthing Unit 2. The door to the head opens inward.

## Known Information Concerning the *ACX Crystal* and Its Operations at the Time of the Collision

53.     The *ACX Crystal* is a 730-foot long, 39,565-deadweight ton container ship that was launched on June 20, 2008.

54.     On June 17, 2017, the registered owner of the *ACX Crystal* was Olympic Steamship Co. S.A., a Panamanian corporation. Upon information and belief, Olympic Steamship Co. S.A. is a special purpose vehicle acting on behalf of Dainichi-Invest Co. Ltd., a Japanese company with its sole office in Kobe, Japan. Upon information and belief, Dainichi-Invest Co. Ltd. is an investment vehicle acting on behalf of the real beneficial owner of the *ACX Crystal*, which is NYK Line.

55.     As NYK Line itself stated in multiple press releases published on its website in the immediate aftermath of the collision, NYK Line was the sole charterer of the *ACX Crystal* on June 17, 2017.[19] Thus, upon information and belief, NYK Line engaged in and/or participated in the negligent conduct that caused the death of the Plaintiffs' decedents in this action. In fact, NYK Line has publicly apologized for the collision.[20]

56.     Upon information and belief, as stated in the English translation of the JTSB Report, at the time of the collision an officer of the *ACX Crystal* was "a navigator of NYK Containr

---

[19] *See* Exhibits 1-4.
[20] *See* Exhibit 1.

[sic] Line Co., Ltd." Further, according to the JTSB Report, NYK Container Line Co. Ltd. was the "operator" of the *ACX Crystal* on June 17, 2017.

57.     Upon information and belief, on June 17, 2017, Asia Container Express, known as ACX, employed the *ACX Crystal* for the purpose of shipping containers. Asia Container Express is the intra-Asia container shipping arm of NYK Line. Thus, on the date of the collision, NYK Line was involved in multiple ways in the operation and navigation of the *ACX Crystal.*

58.     In the minutes preceding the collision, the *ACX Crystal*'s Able-Bodied Seaman saw a vessel, the *USS Fitzgerald*, through his binoculars. He informed the Second Mate, who checked the radar.

59.     Despite knowledge that they were in a high-traffic area with approximately twenty-five vessels in a 20,000 yard radius, neither the Seaman nor the Second Mate nor anyone else involved in the operation of the *ACX Crystal* informed the *ACX Crystal*'s Master of the presence or course of the *USS Fitzgerald*, in violation of the *ACX Crystal*'s own Standing Orders. Neither they, nor anyone else involved in the operation of the *ACX Crystal,* altered their navigation course or attempted to contact the observed vessel at this time. Instead, the *ACX Crystal* simply stayed its course.

60.     At approximately 1:27 AM, just three minutes before the collision, the Second Mate flashed a signal light down the line of bearing toward the *USS Fitzgerald*. Despite taking this action, he did not sound any short blasts whatsoever, let alone the five such blasts required by the International Rules of the Road.

61.     At approximately 1:29 AM, just one minute before the collision, the Second Mate flashed a second light down the line of bearing toward the *USS Fitzgerald*. At the same time, he

took the *ACX Crystal* off of autopilot and attempted to perform very tardy evasive maneuvers in order to avoid the collision.

62.     According to the report titled *Investigation into the Collision at Sea Between USS Fitzgerald (DDG 62) and ACX Crystal on or about 17 June 2017* released by the U.S. Department of the Navy dated 19 December 2017 (henceforth, "Navy Report"),

> **CRYSTAL Bridge watchstanders . . . did not contact the Master prior to the collision, did not sound at least five short blasts, and made no attempt to hail FTZ [Fitzgerald] via bridge-to-bridge radio. CRYSTAL's navigation lights were illuminated, and CRYSTAL was in autopilot until just prior to impact. Prior to the collision, CRYSTAL watchstanders came out of autopilot and initiated a turn to starboard, too late to have adequate effect.**

63.     Because of these and other failures of the *ACX Crystal* and its crew, the bow of the *ACX Crystal* collided with the *USS Fitzgerald* on its starboard side at a high rate of speed.

64.     The Navy Report concluded that one of the "root causes" of the collision was the fact that "CRYSTAL's Second Officer demonstrated poor seamanship contrary to the International Rules of the Road." Specifically, according to the Report's conclusions about the *ACX Crystal*'s Second Officer:

> a.   "He failed to maintain a proper lookout so as to make a full appraisal of the risk of collision with FTZ.
>
> b.   He failed to determine if a risk of collision with FTZ existed by using all available means.

c.   He failed to appreciate, by radar or visual observation, that FTZ was on a constant bearing with a decreasing range, which observation would have led him to deem risk of collision to exist.

d.   With ample time available to take positive action to avoid collision, he failed to take any such action.

e.   He failed to maintain course and speed by turning to port (in accordance with CRYSTAL's voyage plan) despite the risk of collision.

f.   He failed to take action to avoid collision once it became apparent that action by FTZ alone would not avoid the collision.

g.   He failed to give at least five short and rapid blasts on CRYSTAL's whistle once in doubt as to whether FTZ was taking action to avoid collision.

h.   In addition, the Second Officer failed to follow CRYSTAL's Standing Orders by failing to call the Master when FTZ's CPA was within one nautical mile and failing to take frequent and accurate compass bearings of FTZ to detect the risk of collision."

**Damage to the *USS Fitzgerald***

65.   The *ACX Crystal*'s bulbous bow impacted the *USS Fitzgerald* below the waterline just aft of Berthing Unit 2, creating a hole in the hull that was approximately 13' x 17'. The *ACX Crystal* also breached the forward bulkhead of Auxiliary Machine Room 1 (AUX 1).

66.   Above the waterline, the *ACX Crystal*'s port bow impacted the *USS Fitzgerald*'s superstructure from the second level down to the main deck, severely deforming it.



*Figure 4: Front view of damage to USS Fitzgerald above waterline*

67.     Berthing Unit 2 was ***completely flooded*** within two minutes of the collision as a direct result of the impact.

68.     During a post-collision assessment of the Berthing Unit 2 space, it was discovered that many Berthing 2 lockers became unsecured immediately following the collision. In addition, several racks had detached. In particular, the inboard racks of rows 3 and 4 appear to have completely detached from the overhead and collapsed in the space.



*Figure 5: Berthing Unit 2 racks post de-flooding*



*Figure 6: Starboard side of Berthing Unit 2 looking forward to aft from the Chief Petty Officer Gear Locker through the lounge area to the vestibule*

69.     Auxiliary Machinery Room Number 1 was completely flooded as a result of the collision. A 12' x 12' hole was reported in AUX1.

70.     Berthing Unit 1 was partially flooded (five feet of water on deck) as a result of the collision.

71.     According to the Navy Report, there was significant structural damage to the Commanding Officer's Cabin, Repair Locker Number 2 passageway, Combat Information Center passageway, multiple Radar and Radar array rooms, fan rooms, Combat Systems Maintenance Central airlock and ladder-well, Electronic Workshop Number 1, and the Starboard Break.

72.     The damage to the *USS Fitzgerald* as a whole was extensive, with a total estimated repair cost of ***$368.7 million***.[21]

73.     At the time of the collision, all decedents in this Complaint were in areas of the *USS Fitzgerald* dangerously affected by the collision. All decedents in the Complaint suffered serious physical and psychological pain and suffering, as well as pre-death fright, as a direct result of the collision and the actions they took to attempt to save their own lives.

---

[21] USNI News, "USS Fitzgerald Back in Yokosuka After Suffering Damage During Transit" (November 27, 2017), https://news.usni.org/2017/11/27/uss-fitzgerald-back-yokosuka-suffering-damage-transit (accessed Nov. 1, 2019).



*Figure 7: Side view of damage to USS Fitzgerald above waterline*

### Narrative of Berthing Unit 2

74.     Immediately after the collision, water began pouring into Berthing Unit 2. Some Sailors were jolted awake and thrown from their racks. Several witnesses recall rapidly rising water and a wall of water rushing toward them. The water pressure was so intense that several Sailors were pulled away from the port-side scuttle exit by the rushing water. The only light source was ambient light from the scuttle. Many Sailors swam to reach the port-side ladder to exit the unit as the water level rose first to their necks, and then above their heads.

75.     Surviving Sailors also recalled seeing lockers, mattresses, and other debris floating into the aisles between the racks, making it difficult for them to exit the unit speedily and safely.

76.     Two Sailors, including Joshua Tapia, waited at the bottom of the port-side ladder and pushed people through the scuttle. When the water level rose to a level such that they were no longer able to stand, they egressed themselves.

77.     Tapia and the other Sailor waited in the vestibule above the port-side of Berthing Unit 2 and pulled Sailors, including Jackson Schrimsher and John Mead, out of the scuttle. Eventually, water began pouring out of Berthing 2 into the above vestibule. Fearing for the structural integrity of the whole ship, the Sailors ultimately decided to close the scuttle, knowing that all of their shipmates were not accounted for.

78.     Ultimately, 27 Sailors escaped through the port-side scuttle.

79.     Seven (7) Sailors died from drowning in Berthing Unit 2, all of whom were located on the starboard side. At the time, the collision represented the largest loss of life for the United States Navy at sea since 1975. The Legal Representatives of all seven deceased Sailors have brought the instant action.

80.     After the collision, divers who entered the hole on the starboard side of Berthing Unit 2 discovered the bodies of all seven decedents. All had drowned.

**Conscious Pain and Suffering of Decedent Sailors**

81.     The conscious pain and suffering of drowning and near-drowning victims is well-known to be so severe and universal that simulated drowning has been used as a method of harsh interrogation and torture.

82.     None of the decedent Sailors were killed by the initial impact of the collision. On the contrary, all decedent Sailors suffered from a significant period of extreme conscious pain and suffering and pre-death fright from the time of the collision until their deaths by drowning. This conscious pain and suffering included, but was not limited to, the following:

a.  During the estimated 1 to 2 minutes it took for Berthing Unit 2 to fill with water, the decedent Sailors struggled to stay above the surface of the water, experiencing terror, panic, and pre-death fright due to their recognition of the dire circumstances of their situation.

b.  While the water level progressively rose, furniture and other debris became obstacles to their escape, thus leading to increased terror and panic.

c.  In light of the reported water temperature, the decedent Sailors experienced "**cold shock**," consisting of gasping, hyperventilation, peripheral vasoconstriction, increased heart rate and blood pressure, arrhythmia, decreased cerebral blood flow, pain, and activation of temperature-sensitive nerves.

d.  Even after the Sailors in Berthing Unit 2 became totally submerged, all decedent Sailors experienced continued conscious pain and suffering for an additional 2.5 to 3 minutes. The inhalation of seawater as reported in the autopsies of the decedent Sailors is indicative of such consciousness.

e.  Specifically, the conscious pain and suffering after submersion included panic as the Sailors tried to reach the surface, followed by a period of voluntary breath holding until "**air hunger**" and stimulation of the respiratory center in the brain resulted in the inhalation of large volumes of water.

f.  This inhalation of water likely led to coughing, vomiting, and progressive loss of consciousness with associated convulsions and arrhythmias.

g.  As the lungs of the struggling Sailors filled with water, and after being completely submerged for 2 ½ to 3 minutes, there was eventually no longer an opportunity for

gas exchange, and the oxygen in their blood ultimately became insufficient to sustain consciousness and heart function.

**CLAIMS ON BEHALF OF THE DECEDENTS**

**The Death of Shingo Alexander Douglass**

**COUNT I—46 U.S.C. §§ 30301-30308 (DOHSA)**
**WRONGFUL DEATH (PLAINTIFF DOUGLASS)**

83.     Plaintiffs hereby incorporate by reference all paragraphs in the Complaint as though fully alleged herein and further allege as follows:

84.     The claims in the case at bar arise under the Death on the High Seas Act (DOHSA), 46 U.S.C. § 30301 et seq. DOHSA applies to this case in that the negligence committed by personnel of NYK Line in connection with the collision between the *USS Fitzgerald* and the *ACX Crystal*, causing the deaths of seven (7) United States Navy seamen, occurred on the "high seas" more than three nautical miles from the shores of the United States. In addition, Japanese law applies through the application of DOHSA, 46 U.S.C. § 30306, allowing for the recovery of both economic and non-economic damages for wrongful death.

85.     Therefore, Plaintiff Douglass pleads a cause of action for the wrongful death of Shingo Alexander Douglass under 46 U.S.C. § 30302, which states in relevant part that "[w]hen the death of an individual is caused by wrongful act, neglect, or default occurring on the high seas beyond 3 nautical miles from the shore of the United States, the personal representative of the decedent may bring a civil action in admiralty against the person or vessel responsible." 46 U.S.C. § 30302.

86.     Additionally, under 46 U.S.C. § 30306, "[w]hen a cause of action exists under the law of a foreign country for death by wrongful act, neglect, or default on the high seas, a civil

action in admiralty may be brought in a court of the United States based on the foreign cause of action, without abatement of the amount for which recovery is authorized." 46 U.S.C. § 30306.

87.     Japanese law provides for the recovery of damages for the death of an individual caused by the negligence of another. Under Japanese law, legal heirs of the deceased can recover both economic and non-economic damages as a result of the loss of their decedent family member.

88.     At all times relevant herein, NYK Line, as the charterer and employer of the *ACX Crystal* at the time of the collision, is liable for the negligence of the crew of the *ACX Crystal*. The negligent acts and omissions by NYK Line, through the *ACX Crystal*'s crew, include, but are not limited to, the following:

    a.   Failure to contact the Master prior to the collision;

    b.   Failure to sound any short blasts whatsoever, let alone the five such blasts required by the International Rules of the Road;

    c.   Failure to attempt to hail the *USS Fitzgerald* via bridge-to-bridge radio;

    d.   Failure to take the vessel out of autopilot until just prior to impact;

    e.   Failure to perform timely evasive maneuvering to avoid collision;

    f.   Failure to otherwise warn the *USS Fitzgerald* of the impending collision; and

    g.   Failure to otherwise follow the International Rules of the Road and its own standing orders.

89.     As a direct and proximate result of NYK Line's negligence, the *ACX Crystal* struck the *USS Fitzgerald* and caused Shingo Alexander Douglass to suffer injuries, including drowning, which led to his untimely death.

90.     As a direct and proximate result of the collision, Shingo Alexander Douglass suffered from extreme conscious physical, mental, and emotional pain and suffering, as well as

pre-death fright. His immediate pre-death physical injuries included, but are not limited to, injuries to his shoulders, as evidenced by contusions, abrasions, and lacerations.

91.     As a result of the collision and Shingo Alexander Douglass's death, his lawful beneficiaries have suffered and will continue to suffer from extreme anguish and mental suffering, and pecuniary losses, including loss of financial and other support, loss of past income and future wages and wage earning capacity, and loss of household services, among other damages.

**COUNT II—46 U.S.C§§ 30301-30308 (DOHSA)**
**SURVIVAL ACTION (PLAINTIFF DOUGLASS)**

92.     Plaintiffs hereby incorporate by reference all paragraphs in the Complaint as though fully alleged herein and further allege as follows:

93.     Under 46 U.S.C. § 30306, "[w]hen a cause of action exists under the law of a foreign country for death by wrongful act, neglect, or default on the high seas, a civil action in admiralty may be brought in a court of the United States based on the foreign cause of action, without abatement of the amount for which recovery is authorized."  46 U.S.C. § 30306.

94.     Japanese law provides for the recovery of damages for the death of an individual caused by the negligence of another. Under Japanese law, legal heirs of the deceased can recover both economic and non-economic damages as a result of the loss of their decedent family member.

95.     At all times relevant herein, NYK Line, as the charterer and employer of the *ACX Crystal* at the time of the collision, is liable for the negligence of the crew of the *ACX Crystal*. The negligent acts and omissions by NYK Line, through the *ACX Crystal*'s crew, include, but are not limited to, the following:

    a.   Failure to contact the Master prior to the collision;

    b.   Failure to sound any short blasts whatsoever, let alone the five such blasts required by the International Rules of the Road;

    c.   Failure to attempt to hail the *USS Fitzgerald* via bridge-to-bridge radio;

    d.   Failure to take the vessel out of autopilot until just prior to impact;

    e.   Failure to perform timely evasive maneuvering to avoid collision;

    f.   Failure to otherwise warn the *USS Fitzgerald* of the impending collision; and

    g.   Failure to otherwise follow the International Rules of the Road and its own Standing Orders.

96.    As a direct and proximate result of NYK Line's negligence, the *ACX Crystal* struck the *USS Fitzgerald* and caused Shingo Alexander Douglass to suffer injuries, including drowning, which led to his untimely death.

97.    As a direct and proximate result of the collision, Shingo Alexander Douglass suffered from extreme conscious physical, mental, and emotional pain and suffering, as well as pre-death fright. His immediate pre-death physical injuries included, but are not limited to, injuries to his shoulders, as evidenced by contusions, abrasions, and lacerations.

98.    As a result of the collision and Shingo Alexander Douglass's death, his lawful beneficiaries have suffered and will continue to suffer from extreme anguish and mental suffering, and pecuniary losses, including loss of financial and other support, loss of past income and future wages and wage earning capacity, and loss of household services, among other damages.

WHEREFORE, the lawful beneficiaries of Shingo Alexander Douglass demand judgment against NYK Line on all counts in the full and just amount of Ten Million Dollars ($10,000,000.00) plus interest and costs, and seek all damages available under DOHSA, including, but not limited to, those available under United States law pursuant to 46 U.S.C. § 30302 and those available under Japanese law pursuant to 46 U.S.C. § 30306.

**The Death of Plaintiff Noe Hernandez**

COUNT III—46 U.S.C. §§ 30301-30308 (DOHSA)
WRONGFUL DEATH (PLAINTIFF HERNANDEZ)

99.     Plaintiffs hereby incorporate by reference all paragraphs in the Complaint as though fully alleged herein and further allege as follows:

100.     The claims in the case at bar arise under the Death on the High Seas Act (DOHSA), 46 U.S.C. § 30301 et seq. DOHSA applies to this case in that the negligence committed by personnel of NYK Line in connection with the collision between the *USS Fitzgerald* and the *ACX Crystal*, causing the deaths of seven (7) United States Navy seamen, occurred on the "high seas" more than three nautical miles from the shores of the United States. In addition, Japanese law applies through the application of DOHSA, 46 U.S.C. § 30306, allowing for the recovery of both economic and non-economic damages for wrongful death.

101.     Therefore, Plaintiff Hernandez pleads a cause of action for the wrongful death of Noe Hernandez under 46 U.S.C. § 30302, which states in relevant part that "[w]hen the death of an individual is caused by wrongful act, neglect, or default occurring on the high seas beyond 3 nautical miles from the shore of the United States, the personal representative of the decedent may bring a civil action in admiralty against the person or vessel responsible." 46 U.S.C. § 30302.

102.     Additionally, under 46 U.S.C. § 30306, "[w]hen a cause of action exists under the law of a foreign country for death by wrongful act, neglect, or default on the high seas, a civil action in admiralty may be brought in a court of the United States based on the foreign cause of action, without abatement of the amount for which recovery is authorized."  46 U.S.C. § 30306.

103.     Japanese law provides for the recovery of damages for the death of an individual caused by the negligence of another. Under Japanese law, legal heirs of the deceased can recover both economic and non-economic damages as a result of the loss of their decedent family member.

104.     At all times relevant herein, NYK Line, as the charterer and employer of the *ACX Crystal* at the time of the collision, is liable for the negligence of the crew of the *ACX Crystal*. The negligent acts and omissions by NYK Line, through the *ACX Crystal*'s crew, include, but are not limited to, the following:

> h.   Failure to contact the Master prior to the collision;
>
> i.   Failure to sound any short blasts whatsoever, let alone the five such blasts required by the International Rules of the Road;
>
> j.   Failure to attempt to hail the *USS Fitzgerald* via bridge-to-bridge radio;
>
> k.   Failure to take the vessel out of autopilot until just prior to impact;
>
> l.   Failure to perform timely evasive maneuvering to avoid collision;
>
> m.   Failure to otherwise warn the *USS Fitzgerald* of the impending collision; and
>
> n.   Failure to otherwise follow the International Rules of the Road and its own standing orders.

105.     As a direct and proximate result of NYK Line's negligence, the *ACX Crystal* struck the *USS Fitzgerald* and caused Noe Hernandez to suffer injuries, including drowning, which led to his untimely death.

106.     As a direct and proximate result of the collision, Noe Hernandez suffered from extreme conscious physical, mental, and emotional pain and suffering, as well as pre-death fright.

107.     As a result of the collision and Noe Hernandez's death, his lawful beneficiaries have suffered and will continue to suffer from extreme anguish and mental suffering, and pecuniary losses, including loss of financial and other support, loss of past income and future wages and wage earning capacity, loss of household services, loss of inheritance, and loss of nurture, care and guidance for his minor child, among other damages.

## COUNT IV—46 U.S.C. §§ 30301-30308 (DOHSA)
### SURVIVAL ACTION (PLAINTIFF HERNANDEZ)

108.    Plaintiffs hereby incorporate by reference all paragraphs in the Complaint as though fully alleged herein and further allege as follows:

109.    Under 46 U.S.C. § 30306, "[w]hen a cause of action exists under the law of a foreign country for death by wrongful act, neglect, or default on the high seas, a civil action in admiralty may be brought in a court of the United States based on the foreign cause of action, without abatement of the amount for which recovery is authorized." 46 U.S.C. § 30306.

110.    Japanese law provides for the recovery of damages for the death of an individual caused by the negligence of another. Under Japanese law, legal heirs of the deceased can recover both economic and non-economic damages as a result of the loss of their decedent family member.

111.    At all times relevant herein, NYK Line, as the charterer and employer of the *ACX Crystal* at the time of the collision, is liable for the negligence of the crew of the *ACX Crystal*. The negligent acts and omissions by NYK Line, through the *ACX Crystal*'s crew, include, but are not limited to, the following:

a.    Failure to contact the Master prior to the collision;

b.    Failure to sound any short blasts whatsoever, let alone the five such blasts required by the International Rules of the Road;

c.    Failure to attempt to hail the *USS Fitzgerald* via bridge-to-bridge radio;

d.    Failure to take the vessel out of autopilot until just prior to impact;

e.    Failure to perform timely evasive maneuvering to avoid collision;

f.    Failure to otherwise warn the *USS Fitzgerald* of the impending collision; and

g.    Failure to otherwise follow the International Rules of the Road and its own Standing Orders.

112.    As a direct and proximate result of NYK Line's negligence, the *ACX Crystal* struck the *USS Fitzgerald* and caused Noe Hernandez to suffer injuries, including drowning, which led to his untimely death.

113.    As a direct and proximate result of the collision, Noe Hernandez suffered from extreme conscious physical, mental, and emotional pain and suffering, as well as pre-death fright.

114.    As a result of the collision and Noe Hernandez's death, his lawful beneficiaries have suffered and will continue to suffer from extreme anguish and mental suffering, and pecuniary losses, including loss of financial and other support, loss of past income and future wages and wage earning capacity, loss of household services, loss of inheritance, and loss of nurture, care and guidance for his minor child, among other damages.

WHEREFORE, the lawful beneficiaries of Noe Hernandez demand judgment against NYK Line on all counts in the full and just amount of Ten Million Dollars ($10,000,000.00) plus interest and costs, and seek all damages available under DOHSA, including, but not limited to, those available under United States law pursuant to 46 U.S.C. § 30302 and those available under Japanese law pursuant to 46 U.S.C. § 30306.

**The Death of Ngoc Truong Huynh**

### COUNT V—46 U.S.C. §§ 30301-30308 (DOHSA)
### WRONGFUL DEATH (PLAINTIFF HUYNH)

115.    Plaintiffs hereby incorporate by reference all paragraphs in the Complaint as though fully alleged herein and further allege as follows:

116.    The claims in the case at bar arise under the Death on the High Seas Act (DOHSA), 46 U.S.C. § 30301 et seq. DOHSA applies to this case in that the negligence committed by personnel of NYK Line in connection with the collision between the *USS Fitzgerald* and the *ACX Crystal*, causing the deaths of seven (7) United States Navy seamen, occurred on the "high seas"

more than three nautical miles from the shores of the United States. In addition, Japanese law applies through the application of DOHSA, 46 U.S.C. § 30306, allowing for the recovery of both economic and non-economic damages for wrongful death.

117.    Therefore, Plaintiff Huynh pleads a cause of action for the wrongful death of Ngoc Truong Huynh under 46 U.S.C. § 30302, which states in relevant part that "[w]hen the death of an individual is caused by wrongful act, neglect, or default occurring on the high seas beyond 3 nautical miles from the shore of the United States, the personal representative of the decedent may bring a civil action in admiralty against the person or vessel responsible." 46 U.S.C. § 30302.

118.    Additionally, under 46 U.S.C. § 30306, "[w]hen a cause of action exists under the law of a foreign country for death by wrongful act, neglect, or default on the high seas, a civil action in admiralty may be brought in a court of the United States based on the foreign cause of action, without abatement of the amount for which recovery is authorized."  46 U.S.C. § 30306.

119.    Japanese law provides for the recovery of damages for the death of an individual caused by the negligence of another. Under Japanese law, legal heirs of the deceased can recover both economic and non-economic damages as a result of the loss of their decedent family member.

120.    At all times relevant herein, NYK Line, as the charterer and employer of the *ACX Crystal* at the time of the collision, is liable for the negligence of the crew of the *ACX Crystal*. The negligent acts and omissions by NYK Line, through the *ACX Crystal*'s crew, include, but are not limited to, the following:

     a.   Failure to contact the Master prior to the collision;

     b.   Failure to sound any short blasts whatsoever, let alone the five such blasts required by the International Rules of the Road;

     c.   Failure to attempt to hail the *USS Fitzgerald* via bridge-to-bridge radio;

    d.   Failure to take the vessel out of autopilot until just prior to impact;

    e.   Failure to perform timely evasive maneuvering to avoid collision;

    f.   Failure to otherwise warn the *USS Fitzgerald* of the impending collision; and

    g.   Failure to otherwise follow the International Rules of the Road and its own standing orders.

121.    As a direct and proximate result of NYK Line's negligence, the *ACX Crystal* struck the *USS Fitzgerald* and caused Ngoc Truong Huynh to suffer injuries, including drowning, which led to his untimely death.

122.    As a direct and proximate result of the collision, Ngoc Truong Huynh suffered from extreme conscious physical, mental, and emotional pain and suffering, as well as pre-death fright.

123.    As a result of the collision and Ngoc Truong Huynh's death, his lawful beneficiaries have suffered and will continue to suffer from extreme anguish and mental suffering, and pecuniary losses, including loss of financial and other support, loss of past income and future wages and wage earning capacity, and loss of household services, among other damages.

### COUNT VI—46 U.S.C. §§ 30301-30308 (DOHSA)
### SURVIVAL ACTION (PLAINTIFF HUYNH)

124.    Plaintiffs hereby incorporate by reference all paragraphs in the Complaint as though fully alleged herein and further allege as follows:

125.    Under 46 U.S.C. § 30306, "[w]hen a cause of action exists under the law of a foreign country for death by wrongful act, neglect, or default on the high seas, a civil action in admiralty may be brought in a court of the United States based on the foreign cause of action, without abatement of the amount for which recovery is authorized." 46 U.S.C. § 30306.

126.    Japanese law provides for the recovery of damages for the death of an individual caused by the negligence of another. Under Japanese law, legal heirs of the deceased can recover both economic and non-economic damages as a result of the loss of their decedent family member.

127.    At all times relevant herein, NYK Line, as the charterer and employer of the *ACX Crystal* at the time of the collision, is liable for the negligence of the crew of the *ACX Crystal*. The negligent acts and omissions by NYK Line, through the *ACX Crystal*'s crew, include, but are not limited to, the following:

    a.   Failure to contact the Master prior to the collision;

    b.   Failure to sound any short blasts whatsoever, let alone the five such blasts required by the International Rules of the Road;

    c.   Failure to attempt to hail the *USS Fitzgerald* via bridge-to-bridge radio;

    d.   Failure to take the vessel out of autopilot until just prior to impact;

    e.   Failure to perform timely evasive maneuvering to avoid collision;

    f.   Failure to otherwise warn the *USS Fitzgerald* of the impending collision; and

    g.   Failure to otherwise follow the International Rules of the Road and its own Standing Orders.

128.    As a direct and proximate result of NYK Line's negligence, the *ACX Crystal* struck the *USS Fitzgerald* and caused Ngoc Truong Huynh to suffer injuries, including drowning, which led to his untimely death.

129.    As a direct and proximate result of the collision, Ngoc Truong Huynh suffered from extreme conscious physical, mental, and emotional pain and suffering, as well as pre-death fright.

130.    As a result of the collision and Ngoc Truong Huynh's death, his lawful beneficiaries have suffered and will continue to suffer from extreme anguish and mental suffering, and

pecuniary losses, including loss of financial and other support, loss of past income and future wages and wage earning capacity, and loss of household services, among other damages.

WHEREFORE, the lawful beneficiaries of Ngoc Truong Huynh demand judgment against NYK Line on all counts in the full and just amount of Ten Million Dollars ($10,000,000.00) plus interest and costs, and seek all damages available under DOHSA, including, but not limited to, those available under United States law pursuant to 46 U.S.C. § 30302 and those available under Japanese law pursuant to 46 U.S.C. § 30306.

**The Death of Xavier Alec Martin**

COUNT VII—46 U.S.C. §§ 30301-30308 (DOHSA)
WRONGFUL DEATH (PLAINTIFF MARTIN)

131.    Plaintiffs hereby incorporate by reference all paragraphs in the Complaint as though fully alleged herein and further allege as follows:

132.    The claims in the case at bar arise under the Death on the High Seas Act (DOHSA), 46 U.S.C. § 30301 et seq. DOHSA applies to this case in that the negligence committed by personnel of NYK Line in connection with the collision between the *USS Fitzgerald* and the *ACX Crystal*, causing the deaths of seven (7) United States Navy seamen, occurred on the "high seas" more than three nautical miles from the shores of the United States. In addition, Japanese law applies through the application of DOHSA, 46 U.S.C. § 30306, allowing for the recovery of both economic and non-economic damages for wrongful death.

133.    Therefore, Plaintiff Martin pleads a cause of action for the wrongful death of Xavier Alec Martin under 46 U.S.C. § 30302, which states in relevant part that "[w]hen the death of an individual is caused by wrongful act, neglect, or default occurring on the high seas beyond 3 nautical miles from the shore of the United States, the personal representative of the decedent may bring a civil action in admiralty against the person or vessel responsible." 46 U.S.C. § 30302.

134.    Additionally, under 46 U.S.C. § 30306, "[w]hen a cause of action exists under the law of a foreign country for death by wrongful act, neglect, or default on the high seas, a civil action in admiralty may be brought in a court of the United States based on the foreign cause of action, without abatement of the amount for which recovery is authorized."  46 U.S.C. § 30306.

135.    Japanese law provides for the recovery of damages for the death of an individual caused by the negligence of another. Under Japanese law, legal heirs of the deceased can recover both economic and non-economic damages as a result of the loss of their decedent family member.

136.    At all times relevant herein, NYK Line, as the charterer and employer of the *ACX Crystal* at the time of the collision, is liable for the negligence of the crew of the *ACX Crystal*. The negligent acts and omissions by NYK Line, through the *ACX Crystal*'s crew, include, but are not limited to, the following:

  a.   Failure to contact the Master prior to the collision;

  b.   Failure to sound any short blasts whatsoever, let alone the five such blasts required by the International Rules of the Road;

  c.   Failure to attempt to hail the *USS Fitzgerald* via bridge-to-bridge radio;

  d.   Failure to take the vessel out of autopilot until just prior to impact;

  e.   Failure to perform timely evasive maneuvering to avoid collision;

  f.   Failure to otherwise warn the *USS Fitzgerald* of the impending collision; and

  g.   Failure to otherwise follow the International Rules of the Road and its own standing orders.

137.    As a direct and proximate result of NYK Line's negligence, the *ACX Crystal* struck the *USS Fitzgerald* and caused Xavier Alec Martin to suffer injuries, including drowning, which led to his untimely death.

138.    As a direct and proximate result of the collision, Xavier Alec Martin suffered from extreme conscious physical, mental, and emotional pain and suffering, as well as pre-death fright.

139.    As a result of the collision and Xavier Alec Martin's death, his lawful beneficiaries have suffered and will continue to suffer from extreme anguish and mental suffering, and pecuniary losses, including loss of financial and other support, loss of past income and future wages and wage earning capacity, and loss of household services, among other damages.

### COUNT VIII—46 U.S.C. §§ 30301-30308 (DOHSA)
### SURVIVAL ACTION (PLAINTIFF MARTIN)

140.    Plaintiffs hereby incorporate by reference all paragraphs in the Complaint as though fully alleged herein and further allege as follows:

141.    Under 46 U.S.C. § 30306, "[w]hen a cause of action exists under the law of a foreign country for death by wrongful act, neglect, or default on the high seas, a civil action in admiralty may be brought in a court of the United States based on the foreign cause of action, without abatement of the amount for which recovery is authorized."  46 U.S.C. § 30306.

142.    Japanese law provides for the recovery of damages for the death of an individual caused by the negligence of another. Under Japanese law, legal heirs of the deceased can recover both economic and non-economic damages as a result of the loss of their decedent family member.

143.    At all times relevant herein, NYK Line, as the charterer and employer of the *ACX Crystal* at the time of the collision, is liable for the negligence of the crew of the *ACX Crystal*. The negligent acts and omissions by NYK Line, through the *ACX Crystal*'s crew, include, but are not limited to, the following:

      a.    Failure to contact the Master prior to the collision;

      b.    Failure to sound any short blasts whatsoever, let alone the five such blasts required by the International Rules of the Road;

    c.   Failure to attempt to hail the *USS Fitzgerald* via bridge-to-bridge radio;

    d.   Failure to take the vessel out of autopilot until just prior to impact;

    e.   Failure to perform timely evasive maneuvering to avoid collision;

    f.   Failure to otherwise warn the *USS Fitzgerald* of the impending collision; and

    g.   Failure to otherwise follow the International Rules of the Road and its own Standing Orders.

144.    As a direct and proximate result of NYK Line's negligence, the *ACX Crystal* struck the *USS Fitzgerald* and caused Xavier Alec Martin to suffer injuries, including drowning, which led to his untimely death.

145.    As a direct and proximate result of the collision, Xavier Alec Martin suffered from extreme conscious physical, mental, and emotional pain and suffering, as well as pre-death fright.

146.    As a result of the collision and Xavier Alec Martin's death, his lawful beneficiaries have suffered and will continue to suffer from extreme anguish and mental suffering, and pecuniary losses, including loss of financial and other support, loss of past income and future wages and wage earning capacity, and loss of household services, among other damages.

WHEREFORE, the lawful beneficiaries of Xavier Alec Martin demand judgment against NYK Line on all counts in the full and just amount of Ten Million Dollars ($10,000,000.00) plus interest and costs, and seek all damages available under DOHSA, including, but not limited to, those available under United States law pursuant to 46 U.S.C. § 30302 and those available under Japanese law pursuant to 46 U.S.C. § 30306.

**The Death of Gary Leo Rehm, Jr.**

### COUNT IX—46 U.S.C. §§ 30301-30308 (DOHSA)
### WRONGFUL DEATH (PLAINTIFF REHM)

147.    Plaintiffs hereby incorporate by reference all paragraphs in the Complaint as though fully alleged herein and further allege as follows:

148.    The claims in the case at bar arise under the Death on the High Seas Act (DOHSA), 46 U.S.C. § 30301 et seq. DOHSA applies to this case in that the negligence committed by personnel of NYK Line in connection with the collision between the *USS Fitzgerald* and the *ACX Crystal*, causing the deaths of seven (7) United States Navy seamen, occurred on the "high seas" more than three nautical miles from the shores of the United States. In addition, Japanese law applies through the application of DOHSA, 46 U.S.C. § 30306, allowing for the recovery of both economic and non-economic damages for wrongful death.

149.    Therefore, Plaintiff Rehm pleads a cause of action for the wrongful death of Gary Leo Rehm, Jr. under 46 U.S.C. § 30302, which states in relevant part that "[w]hen the death of an individual is caused by wrongful act, neglect, or default occurring on the high seas beyond 3 nautical miles from the shore of the United States, the personal representative of the decedent may bring a civil action in admiralty against the person or vessel responsible." 46 U.S.C. § 30302.

150.    Additionally, under 46 U.S.C. § 30306, "[w]hen a cause of action exists under the law of a foreign country for death by wrongful act, neglect, or default on the high seas, a civil action in admiralty may be brought in a court of the United States based on the foreign cause of action, without abatement of the amount for which recovery is authorized."  46 U.S.C. § 30306.

151.    Japanese law provides for the recovery of damages for the death of an individual caused by the negligence of another. Under Japanese law, legal heirs of the deceased can recover both economic and non-economic damages as a result of the loss of their decedent family member.

152.    At all times relevant herein, NYK Line, as the charterer and employer of the *ACX Crystal* at the time of the collision, is liable for the negligence of the crew of the *ACX Crystal*. The negligent acts and omissions by NYK Line, through the *ACX Crystal*'s crew, include, but are not limited to, the following:

a.   Failure to contact the Master prior to the collision;

b.   Failure to sound any short blasts whatsoever, let alone the five such blasts required by the International Rules of the Road;

c.   Failure to attempt to hail the *USS Fitzgerald* via bridge-to-bridge radio;

d.   Failure to take the vessel out of autopilot until just prior to impact;

e.   Failure to perform timely evasive maneuvering to avoid collision;

f.   Failure to otherwise warn the *USS Fitzgerald* of the impending collision; and

g.   Failure to otherwise follow the International Rules of the Road and its own standing orders.

153.    As a direct and proximate result of NYK Line's negligence, the *ACX Crystal* struck the *USS Fitzgerald* and caused Gary Leo Rehm, Jr. to suffer injuries, including drowning, which led to his untimely death.

154.    As a direct and proximate result of the collision, Gary Leo Rehm, Jr. suffered from extreme conscious physical, mental, and emotional pain and suffering, as well as pre-death fright.

155.    As a result of the collision and Gary Leo Rehm, Jr.'s death, his lawful beneficiaries have suffered and will continue to suffer from extreme anguish and mental suffering, and pecuniary losses, including loss of financial and other support, loss of past income and future wages and wage earning capacity, and loss of household services, among other damages.

### Count X—46 U.S.C. §§ 30301-30308 (DOHSA)
### Survival Action (Plaintiff Rehm)

156.    Plaintiffs hereby incorporate by reference all paragraphs in the Complaint as though fully alleged herein and further allege as follows:

157.    Under 46 U.S.C. § 30306, "[w]hen a cause of action exists under the law of a foreign country for death by wrongful act, neglect, or default on the high seas, a civil action in admiralty may be brought in a court of the United States based on the foreign cause of action, without abatement of the amount for which recovery is authorized."  46 U.S.C. § 30306.

158.    Japanese law provides for the recovery of damages for the death of an individual caused by the negligence of another. Under Japanese law, legal heirs of the deceased can recover both economic and non-economic damages as a result of the loss of their decedent family member.

159.    At all times relevant herein, NYK Line, as the charterer and employer of the *ACX Crystal* at the time of the collision, is liable for the negligence of the crew of the *ACX Crystal*. The negligent acts and omissions by NYK Line, through the *ACX Crystal*'s crew, include, but are not limited to, the following:

    a.   Failure to contact the Master prior to the collision;

    b.   Failure to sound any short blasts whatsoever, let alone the five such blasts required by the International Rules of the Road;

    c.   Failure to attempt to hail the *USS Fitzgerald* via bridge-to-bridge radio;

    d.   Failure to take the vessel out of autopilot until just prior to impact;

    e.   Failure to perform timely evasive maneuvering to avoid collision;

    f.   Failure to otherwise warn the *USS Fitzgerald* of the impending collision; and

    g.   Failure to otherwise follow the International Rules of the Road and its own Standing Orders.

160.    As a direct and proximate result of NYK Line's negligence, the *ACX Crystal* struck the *USS Fitzgerald* and caused Gary Leo Rehm, Jr. to suffer injuries, including drowning, which led to his untimely death.

161.    As a direct and proximate result of the collision, Gary Leo Rehm, Jr. suffered from extreme conscious physical, mental, and emotional pain and suffering, as well as pre-death fright.

162.    As a result of the collision and Gary Leo Rehm, Jr.'s death, his lawful beneficiaries have suffered and will continue to suffer from extreme anguish and mental suffering, and pecuniary losses, including loss of financial and other support, loss of past income and future wages and wage earning capacity, and loss of household services, among other damages.

WHEREFORE, the lawful beneficiaries of Gary Leo Rehm, Jr. demand judgment against NYK Line on all counts in the full and just amount of Ten Million Dollars ($10,000,000.00) plus interest and costs, and seek all damages available under DOHSA, including, but not limited to, those available under United States law pursuant to 46 U.S.C. § 30302 and those available under Japanese law pursuant to 46 U.S.C. § 30306.

**The Death of Dakota Kyle Rigsby**

COUNT XI—46 U.S.C. §§ 30301-30308 (DOHSA)
WRONGFUL DEATH (PLAINTIFF RIGSBY)

163.    Plaintiffs hereby incorporate by reference all paragraphs in the Complaint as though fully alleged herein and further allege as follows:

164.    The claims in the case at bar arise under the Death on the High Seas Act (DOHSA), 46 U.S.C. § 30301 et seq. DOHSA applies to this case in that the negligence committed by personnel of NYK Line in connection with the collision between the *USS Fitzgerald* and the *ACX Crystal*, causing the deaths of seven (7) United States Navy seamen, occurred on the "high seas" more than three nautical miles from the shores of the United States. In addition, Japanese law

applies through the application of DOHSA, 46 U.S.C. § 30306, allowing for the recovery of both economic and non-economic damages for wrongful death.

165.   Therefore, Plaintiff Rigsby pleads a cause of action for the wrongful death of Dakota Kyle Rigsby under 46 U.S.C. § 30302, which states in relevant part that "[w]hen the death of an individual is caused by wrongful act, neglect, or default occurring on the high seas beyond 3 nautical miles from the shore of the United States, the personal representative of the decedent may bring a civil action in admiralty against the person or vessel responsible." 46 U.S.C. § 30302.

166.   Additionally, under 46 U.S.C. § 30306, "[w]hen a cause of action exists under the law of a foreign country for death by wrongful act, neglect, or default on the high seas, a civil action in admiralty may be brought in a court of the United States based on the foreign cause of action, without abatement of the amount for which recovery is authorized." 46 U.S.C. § 30306.

167.   Japanese law provides for the recovery of damages for the death of an individual caused by the negligence of another. Under Japanese law, legal heirs of the deceased can recover both economic and non-economic damages as a result of the loss of their decedent family member.

168.   At all times relevant herein, NYK Line, as the charterer and employer of the *ACX Crystal* at the time of the collision, is liable for the negligence of the crew of the *ACX Crystal*. The negligent acts and omissions by NYK Line, through the *ACX Crystal*'s crew, include, but are not limited to, the following:

    a.   Failure to contact the Master prior to the collision;

    b.   Failure to sound any short blasts whatsoever, let alone the five such blasts required by the International Rules of the Road;

    c.   Failure to attempt to hail the *USS Fitzgerald* via bridge-to-bridge radio;

    d.   Failure to take the vessel out of autopilot until just prior to impact;

e.  Failure to perform timely evasive maneuvering to avoid collision;

f.  Failure to otherwise warn the *USS Fitzgerald* of the impending collision; and

g.  Failure to otherwise follow the International Rules of the Road and its own standing orders.

169.  As a direct and proximate result of NYK Line's negligence, the *ACX Crystal* struck the *USS Fitzgerald* and caused Dakota Kyle Rigsby to suffer injuries, including drowning, which led to his untimely death.

170.  As a direct and proximate result of the collision, Dakota Kyle Rigsby suffered from extreme conscious physical, mental, and emotional pain and suffering, as well as pre-death fright.

171.  As a result of the collision and Dakota Kyle Rigsby's death, his lawful beneficiaries have suffered and will continue to suffer from extreme anguish and mental suffering, and pecuniary losses, including loss of financial and other support, loss of past income and future wages and wage earning capacity, and loss of household services, among other damages.

### COUNT XII—46 U.S.C. §§ 30301-30308 (DOHSA)
### SURVIVAL ACTION (PLAINTIFF RIGSBY)

172.  Plaintiffs hereby incorporate by reference all paragraphs in the Complaint as though fully alleged herein and further allege as follows:

173.  Under 46 U.S.C. § 30306, "[w]hen a cause of action exists under the law of a foreign country for death by wrongful act, neglect, or default on the high seas, a civil action in admiralty may be brought in a court of the United States based on the foreign cause of action, without abatement of the amount for which recovery is authorized."  46 U.S.C. § 30306.

174.  Japanese law provides for the recovery of damages for the death of an individual caused by the negligence of another. Under Japanese law, legal heirs of the deceased can recover both economic and non-economic damages as a result of the loss of their decedent family member.

175.    At all times relevant herein, NYK Line, as the charterer and employer of the *ACX Crystal* at the time of the collision, is liable for the negligence of the crew of the *ACX Crystal*. The negligent acts and omissions by NYK Line, through the *ACX Crystal*'s crew, include, but are not limited to, the following:

    a.   Failure to contact the Master prior to the collision;

    b.   Failure to sound any short blasts whatsoever, let alone the five such blasts required by the International Rules of the Road;

    c.   Failure to attempt to hail the *USS Fitzgerald* via bridge-to-bridge radio;

    d.   Failure to take the vessel out of autopilot until just prior to impact;

    e.   Failure to perform timely evasive maneuvering to avoid collision;

    f.   Failure to otherwise warn the *USS Fitzgerald* of the impending collision; and

    g.   Failure to otherwise follow the International Rules of the Road and its own Standing Orders.

176.    As a direct and proximate result of NYK Line's negligence, the *ACX Crystal* struck the *USS Fitzgerald* and caused Dakota Kyle Rigsby to suffer injuries, including drowning, which led to his untimely death.

177.    As a direct and proximate result of the collision, Dakota Kyle Rigsby suffered from extreme conscious physical, mental, and emotional pain and suffering, as well as pre-death fright.

178.    As a result of the collision and Dakota Kyle Rigsby's death, his lawful beneficiaries have suffered and will continue to suffer from extreme anguish and mental suffering, and pecuniary losses, including loss of financial and other support, loss of past income and future wages and wage earning capacity, and loss of household services, among other damages.

WHEREFORE, the lawful beneficiaries of Dakota Kyle Rigsby demand judgment against NYK Line on all counts in the full and just amount of Ten Million Dollars ($10,000,000.00) plus interest and costs, and seek all damages available under DOHSA, including, but not limited to, those available under United States law pursuant to 46 U.S.C. § 30302 and those available under Japanese law pursuant to 46 U.S.C. § 30306.

**The Death of Carlos Victor Ganzon Sibayan**

COUNT XIII—46 U.S.C. §§ 30301-30308 (DOHSA)
WRONGFUL DEATH (PLAINTIFF SIBAYAN)

179.   Plaintiffs hereby incorporate by reference all paragraphs in the Complaint as though fully alleged herein and further allege as follows:

180.   The claims in the case at bar arise under the Death on the High Seas Act (DOHSA), 46 U.S.C. § 30301 et seq. DOHSA applies to this case in that the negligence committed by personnel of NYK Line in connection with the collision between the *USS Fitzgerald* and the *ACX Crystal*, causing the deaths of seven (7) United States Navy seamen, occurred on the "high seas" more than three nautical miles from the shores of the United States. In addition, Japanese law applies through the application of DOHSA, 46 U.S.C. § 30306, allowing for the recovery of both economic and non-economic damages for wrongful death.

181.   Therefore, Plaintiff Sibayan pleads a cause of action for the wrongful death of Carlos Victor Ganzon Sibayan under 46 U.S.C. § 30302, which states in relevant part that "[w]hen the death of an individual is caused by wrongful act, neglect, or default occurring on the high seas beyond 3 nautical miles from the shore of the United States, the personal representative of the decedent may bring a civil action in admiralty against the person or vessel responsible." 46 U.S.C. § 30302.

182.     Additionally, under 46 U.S.C. § 30306, "[w]hen a cause of action exists under the law of a foreign country for death by wrongful act, neglect, or default on the high seas, a civil action in admiralty may be brought in a court of the United States based on the foreign cause of action, without abatement of the amount for which recovery is authorized."  46 U.S.C. § 30306.

183.     Japanese law provides for the recovery of damages for the death of an individual caused by the negligence of another. Under Japanese law, legal heirs of the deceased can recover both economic and non-economic damages as a result of the loss of their decedent family member.

184.     At all times relevant herein, NYK Line, as the charterer and employer of the *ACX Crystal* at the time of the collision, is liable for the negligence of the crew of the *ACX Crystal*. The negligent acts and omissions by NYK Line, through the *ACX Crystal*'s crew, include, but are not limited to, the following:

  a.   Failure to contact the Master prior to the collision;

  b.   Failure to sound any short blasts whatsoever, let alone the five such blasts required by the International Rules of the Road;

  c.   Failure to attempt to hail the *USS Fitzgerald* via bridge-to-bridge radio;

  d.   Failure to take the vessel out of autopilot until just prior to impact;

  e.   Failure to perform timely evasive maneuvering to avoid collision;

  f.   Failure to otherwise warn the *USS Fitzgerald* of the impending collision; and

  g.   Failure to otherwise follow the International Rules of the Road and its own standing orders.

185.     As a direct and proximate result of NYK Line's negligence, the *ACX Crystal* struck the *USS Fitzgerald* and caused Carlos Victor Ganzon Sibayan to suffer injuries, including drowning, which led to his untimely death.

186.     As a direct and proximate result of the collision, Carlos Victor Ganzon Sibayan suffered from extreme conscious physical, mental, and emotional pain and suffering, as well as pre-death fright.

187.     As a result of the collision and Carlos Victor Ganzon Sibayan's death, his lawful beneficiaries have suffered and will continue to suffer from extreme anguish and mental suffering, and pecuniary losses, including loss of financial and other support, loss of past income and future wages and wage earning capacity, and loss of household services, among other damages.

### COUNT XIV—46 U.S.C. §§ 30301-30308 (DOHSA)
### SURVIVAL ACTION (PLAINTIFF SIBAYAN)

188.     Plaintiffs hereby incorporate by reference all paragraphs in the Complaint as though fully alleged herein and further allege as follows:

189.     Under 46 U.S.C. § 30306, "[w]hen a cause of action exists under the law of a foreign country for death by wrongful act, neglect, or default on the high seas, a civil action in admiralty may be brought in a court of the United States based on the foreign cause of action, without abatement of the amount for which recovery is authorized."  46 U.S.C. § 30306.

190.     Japanese law provides for the recovery of damages for the death of an individual caused by the negligence of another. Under Japanese law, legal heirs of the deceased can recover both economic and non-economic damages as a result of the loss of their decedent family member.

191.     At all times relevant herein, NYK Line, as the charterer and employer of the *ACX Crystal* at the time of the collision, is liable for the negligence of the crew of the *ACX Crystal*. The negligent acts and omissions by NYK Line, through the *ACX Crystal*'s crew, include, but are not limited to, the following:

   a.   Failure to contact the Master prior to the collision;

b. Failure to sound any short blasts whatsoever, let alone the five such blasts required by the International Rules of the Road;

c. Failure to attempt to hail the *USS Fitzgerald* via bridge-to-bridge radio;

d. Failure to take the vessel out of autopilot until just prior to impact;

e. Failure to perform timely evasive maneuvering to avoid collision;

f. Failure to otherwise warn the *USS Fitzgerald* of the impending collision; and

g. Failure to otherwise follow the International Rules of the Road and its own Standing Orders.

192.    As a direct and proximate result of NYK Line's negligence, the *ACX Crystal* struck the *USS Fitzgerald* and caused Carlos Victor Ganzon Sibayan to suffer injuries, including drowning, which led to his untimely death.

193.    As a direct and proximate result of the collision, Carlos Victor Ganzon Sibayan suffered from extreme conscious physical, mental, and emotional pain and suffering, as well as pre-death fright.

194.    As a result of the collision and Carlos Victor Ganzon Sibayan's death, his lawful beneficiaries have suffered and will continue to suffer from extreme anguish and mental suffering, and pecuniary losses, including loss of financial and other support, loss of past income and future wages and wage earning capacity, and loss of household services, among other damages.

WHEREFORE, the lawful beneficiaries of Carlos Victor Ganzon Sibayan demand judgment against NYK Line on all counts in the full and just amount of Ten Million Dollars ($10,000,000.00) plus interest and costs, and seek all damages available under DOHSA, including, but not limited to, those available under United States law pursuant to 46 U.S.C. § 30302 and those available under Japanese law pursuant to 46 U.S.C. § 30306.

## JURY DEMAND

Plaintiffs request a jury trial regarding liability and damages for all counts of this Complaint.

Respectfully submitted,

By:  */s/ Craig Isenberg*
     Craig Isenberg, T.A., 29603
     Laurence D LeSueur, Jr., 35206
     BARRASSO USDIN KUPPERMAN
        FREEMAN & SARVER, L.L.C.
     909 Poydras Street, Suite 2350
     New Orleans, Louisiana  70112
     Telephone:  (504) 589-9700
     Facsimile:  (504) 589-9701
     cisenberg@barrassousdin.com
     llesueur@barrassousdin.com
     *Counsel for Plaintiffs*